IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| MICHAEL HILL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:21-cv-00466-RK |
| | ) |
| DENIS MCDONOUGH, SECRETARY UNITED STATES DEPARTMENT OF VETERANS AFFAIRS, | ) |
| | ) |
| Defendant. | ) |

## ORDER

Before the Court is Defendant's motion for summary judgment. (Doc. 19.) The motion is fully briefed. (Docs. 30, 34.) After careful consideration and for the reasons explained below, the motion is **GRANTED**.

### I. Background

Except where otherwise noted, these facts are taken from the parties' statements of uncontroverted material facts. The Court has omitted facts properly controverted, facts asserted that are immaterial to the resolution of the pending motion, facts asserted that are not properly supported by admissible evidence, legal conclusions, and argument presented as an assertion of fact. Before proceeding further, the Court highlights two noticeable deficiencies in Plaintiff's summary judgment briefing regarding the development of the facts at the summary judgment stage. First, many of Plaintiff's proffered facts lack an accurate citation to the summary judgment record (i.e., are not supported by the record cited), mischaracterize the cited record, or are arguments presented as facts.[1] Federal Rule of Civil Procedure 56(c) requires that a party support

---

[1] Below are a few examples from Plaintiff's additional statement of facts:
- Plaintiff asserts: "Plaintiff's degrees became the topic of conversation. On multiple occasions between 2011 and 2019, Plaintiff was asked if the degrees were real. The last time anyone made fun of the fact that he was a black man with advanced degrees was December of 2018. ([Doc. 31-9), Hill Declaration)." Plaintiff's affidavit (Doc. 31-9) contains no such assertion, however.
- Plaintiff asserts: "[Plaintiff] discovered through the media that the racial discrimination went all the way to the top of the Veteran's Administration," citing in support of this assertion of fact only an attached news article from The New Republic. (Docs. 30 at 30, ¶ 115; 31-15.)

an assertion of fact by "citing to particular parts of materials in the records," including depositions, affidavits or declarations, etc. Fed. R. Civ. P. 56(c)(1)(A).

Second, and more significant, Plaintiff relies in part on his own unsworn declaration submitted in opposition to Defendant's motion for summary judgment. (Doc. 31-9.) Rule 56 of the Federal Rules of Civil Procedure, governing summary judgment practice in federal court, expressly allows use of an affidavit or declaration to support or oppose a summary judgment motion. Rule 56(c)(4). The validity of an unsworn declaration such as this one (as opposed to an affidavit or sworn declaration) is governed by 28 U.S.C. § 1746. Under § 1746 unsworn declarations have the same "force and effect" as affidavits or sworn declarations, so long as the unsworn declaration is:

> in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form: . . . "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date). (Signature)."

*See Banks v. Deere*, 829 F.3d 661, 668 (8th Cir. 2016) ("an unsworn declaration or statement must be written, signed, dated, and certified as true and correct 'under penalty of perjury'"). Plaintiff's unsworn declaration, however, is neither dated nor certified as true and correct "under penalty of perjury." As a result, the Court does not consider Plaintiff's unsworn declaration in evaluating Defendant's motion to dismiss. *See Elder-Keep v. Aksamit*, 460 F.3d 979, 984 (8th Cir. 2006) (district court did not err in *sua sponte* excluding affidavits that were not executed under penalty of perjury); *see also Banks*, 829 F.3d at 668 (unsworn and unattested statements that do not satisfy § 1746 do not properly oppose motion for summary judgment); Rule 56(e)(3) (if the opposing

---

- Plaintiff asserts: "[W]hen trainings were being given, Ms. Miller used Plaintiff and Ms. Anderson of examples of what not to do. ([Doc. 31-8], ROI 1067 p. 000062)." The referenced citation (what appears to be a portion of the record of investigation developed by the Veterans Administration in responding to Plaintiff's complaints of discrimination at the administrative level) provides no support for this asserted fact.
- Plaintiff asserts: "Ms. Miller continually stripped away plaintiff's duties. ([Doc. 31-8], ROI 1067 p. 000- 73). Eventually, all he had left was the Daily Review until it was given to Aaron Wilder. ([Doc. 31-8], ROI 1067 000072)." Nothing in the cited administrative record supports this assertion.
- Finally, Plaintiff asserts: "[Plaintiff] knew that the Collective Bargaining Agreement required him to be reassigned, demoted or removed upon receipt of the unacceptable performance appraisal. ([Doc. 31-18], CBA Art. 27)." Nothing in the attached "Article 27," presumably the referenced applicable CBA, supports this assertion.

2

party fails to support assertions of fact or to properly address an assertion of fact under Rule 56(c) the court may grant summary judgment if otherwise appropriate).

The Court finds the following facts for purposes of ruling on Defendant's summary judgment motion:

Plaintiff Michael Hill worked at the United States Department of Veterans Affairs in Kansas City, Missouri, for approximately nine years, between 2010 and 2019. Plaintiff is an African-American male. While employed at the Kansas City VA, Plaintiff was in his mid-50s. He has a Bachelor of Arts degree in accounting as well as two Master's degrees in accounting and business administration. Plaintiff was employed by the Kansas City VA as an Accounting Technician, a GS-6 level position.[2] As an Accounting Technician, Plaintiff performed various duties including opening, maintaining, reconciling, and closing accounts, as well as performing accounting transactions, among other specific duties.

In January 2018, Marjie Miller[3] became Plaintiff's supervisor. In an affidavit, Ms. Miller attested that she had been aware that Plaintiff had previously filed complaints with the Equal Employment Opportunity Commission, but that she was not aware of any specific details or outcomes. In fact, during a December 4, 2018 annual performance evaluation meeting, Plaintiff had tried to give Ms. Miller details about the prior issues, but Ms. Miller stopped him from doing so. (Doc. 19-6 at 2.)

The December 4 annual performance evaluation for the Fiscal Year 2018 was the first annual performance rating Ms. Miller gave Plaintiff. Previously, between 2015 and 2018, Plaintiff had received fully satisfactory performance evaluations from other supervisors. In May 2018, Ms. Miller gave Plaintiff a fully successful rating, although in October 2018 Ms. Miller gave him an unsuccessful rating. For his 2018 annual performance evaluation, Ms. Miller gave Plaintiff a fully successful rating or exceptional rating in three areas but ultimately evaluated Plaintiff's performance as unacceptable in several other areas, resulting in an overall performance rating of

---

[2] "GS" level refers to the General Schedule classification and pay system utilized by the federal government for civilian employees. *See Policy, Data, Oversight, Pay & Leave: General Schedule Overview*, OPM.GOV, https://www.opm.gov/policy-data-oversight/pay-leave/pay-systems/general-schedule/ (last visited Jan. 27, 2023).

[3] Although Defendant refers to "Marjorie Miller" in its summary judgment briefing, it appears Plaintiff's supervisor was Marjie Miller.

3

unacceptable. Ms. Miller explained that she issued this rating because she observed failures in Plaintiff's systems thinking, critical thinking, personal mastery, and technical competency.

After receiving this review, Plaintiff was given 60 days to improve his performance. Plaintiff had never received a formal performance improvement plan previously. In February 2019, Plaintiff was issued formal performance counseling after Ms. Miller determined he had not sufficiently improved within the 60-day window. Ms. Miller did not give an unacceptable performance rating or subsequent counseling for any other employee.

### *Discriminatory Comments*

Plaintiff alleges that throughout his time at the Kansas City VA he was often called racial slurs such as "boy" by several individuals, including a prior supervisor. Plaintiff also alleges that in several meetings Ms. Miller made statements including, "don't let these people hustle you" and "you know how these people are"; Plaintiff testified at his deposition that he understood these statements as a "euphemism pointed at African-Americans and black people . . . to say that they're lazy"). (Doc. 31-1 at 16, 17.)

### *Training Opportunities and Related Conduct*

Plaintiff testified in his deposition that although he was supposed to be trained as an accountant, when he would go to other accountants to try to get that training, he was told "that they are too busy" and that he needed to "just sit at my desk and wait until somebody is sent over to me." (Doc. 19-1 at 12.) Plaintiff testified that he requested specific training regarding "obligating and reports related to FMS reports," for which Ms. Miller assigned Veronica Manges, a GS-11 Accountant who had only been at the VA for approximately six months at the time. Plaintiff testified that Ms. Manges was unable to answer his questions and that he had to teach her things and generally "get[] her up to speed." (Doc. 19-1 at 13.) In addition, Plaintiff testified that Ms. Miller "told me when to interact with [Ms. Manges]"; specifically, Plaintiff testified that Ms. Miller would send him an email when Ms. Manges was available. (Doc. 19-1 at 18.) In an affidavit, Ms. Miller stated that she had instructed Plaintiff to "work independently" and to write down questions as they came up for later one-on-one training sessions with Ms. Manges. (Doc. 19-4 at 11.) Plaintiff testified that the training with Ms. Manges simply "never happened." (*Id.*)

Finally, Plaintiff testified that Ms. Miller – Plaintiff's supervisor and a "supervisory accountant" – would stand behind him and instruct him how to do things. Plaintiff testified that these interactions were "degrading" and "intimidating," and that Ms. Miller would loudly make

4

corrections, and if Plaintiff asked a question, Ms. Miller would often leave and not return. Finally, Plaintiff testified that Ms. Miller would "mak[e] faces every time I walk[ed] out of her office." (Doc. 19-1 at 15.)

### *Comp Time*

In late January 2019, Plaintiff requested "comp time"[4] "for the next few months." (Doc. 19-4 at 11.) Ms. Miller denied the request. In the affidavit, Ms. Miller attested that the month prior, only one employee was approved for comp time (specifically, one hour and fifteen minutes) due to a mandatory team meeting after their tour of duty had ended. (Doc. 19-4 at 11.) Plaintiff testified at his deposition that a female employee and a white male employee were granted overtime while he was denied comp time and that he was "never paid overtime." (Doc. 19-1 at 30.)

### *Worker Compensation Claim*

Plaintiff made a worker's compensation claim in February 2019 after he fell in the office in late January 2019. Part of his worker's compensation claim was contested by the VA, however. Plaintiff was informed that his claimed injuries to his knee were not accepted for worker's compensation coverage in light of a knee replacement surgery that had been scheduled prior to his fall and subsequent worker's compensation claim.

### *Reassignment of Duties*

Plaintiff went on medical leave in February 2019. (Doc. 19-1 at 21.) The following month, Plaintiff's alternative agency cashier duties were reassigned. Ms. Miller attested that these duties were temporarily reassigned (rather than permanently removed) after Plaintiff sent an email to VA staff stating that he was "expecting to be out of the office until after my second knee surgery and recovery period, around August." (Doc. 19-4 at 11.) Ms. Miller further attested that VA policy required designation of a replacement when "the absences of both the Principal Agent Cashier and Alternate Agency Cashier are expected to be prolonged." (Doc. 19-4 at 11-12.)

### *Plaintiff's Resignation*

At his deposition, Plaintiff testified that while on medical leave, he was scheduled to meet with the CFO of the Kansas City VA, Bryan Bieri, on June 7, 2019. (Doc. 19-1 at 21.) After the meeting had been scheduled but before the meeting occurred, Plaintiff testified that he received a

---

[4] The summary judgment record is not entirely clear what Plaintiff means by referring to "comp time."

follow-up email asking him to detail "what it is specifically that I wanted to discuss." (Doc. 19-1 at 23.) After receiving this follow-up email, on May 23, 2019, Plaintiff drafted a two-week notice of resignation. (*Id.*)

Plaintiff testified that he thought the meeting was just with Mr. Bieri and that it was only to "say hi to my coworkers that I'm doing well." (Doc. 19-1 at 24.) Plaintiff arrived at the meeting with Mr. Bieri to find others in the meeting as well including an assistant CFO, Plaintiff's supervisor (Ms. Miller), and a representative from human resources. (Doc. 19-1 at 24.) Plaintiff testified that after "say[ing] hi to everybody," they went into Mr. Bieri's office, and after "three or four minutes" of silence, he gave them the resignation letter he had previously drafted and brought with him to the meeting. (Doc. 19-1 at 24.) Plaintiff testified that the human resources representative asked if his resignation could "be effective today," to which Plaintiff agreed after he was reassured that doing so would help him "get access to my TSP [Thrift Savings Plan] sooner." (Doc. 19-1 at 24.)

### *Delayed Access to TSP Funds*

When he resigned effective immediately, Plaintiff testified that he was told by the human resources representative that he would receive his TSP funds "within a week, three or four days." After this did not happen, and one or two months after he had resigned and had not yet received any TSP funds, Plaintiff reached out to the out-of-state administrator who oversees TSP fund distributions. The TSP administrator told him that human resources from the Kansas City VA had not yet provided a code they needed to disburse the funds. At the same time, Plaintiff was told by Kansas City VA human resources that his resignation had been processed. Although he did ultimately receive the TSP funds he was due, Plaintiff testified that the delay was "indicative of the way that the VA has treated me as an employee," including "retaliating against me on occasion." (Doc. 19-1 at 25.)

### *Letters of Indebtedness*

Approximately one month after he resigned, Plaintiff was issued two letters of indebtedness concerning advanced leave he had taken between February and June 2019 prior to his resignation. (Doc. 19-1 at 25.) Plaintiff testified that he had initially intended to pay back the advanced leave through continuing to work. While other employees have received similar letters of indebtedness, Plaintiff testified that he believed the letters "shouldn't have come up that quick."

*Administrative Proceedings*

From December 2018 to summer 2019, Plaintiff filed numerous informal administrative complaints from which he received several Notices of Right to file Formal Complaints. (Doc. 1 at ¶ 8.) The two administrative complaints of discrimination were assigned Case Nos. 200J-0589-2019101067 ("EEO Case 1067") and 200J-0589-2019104686 ("EEO Case 4686"). (*Id.*) Plaintiff generally alleged charges of race, disability, sex, and age discrimination, as well as retaliation for having engaged in protected activity. (*Id.* at ¶ 10.) Specifically, in the complaint in EEO Case 1067, filed on February 6, 2019, Plaintiff asserted various claims for retaliation and discrimination based on disability, race, sex, and age based on the following:

- From "1/29/2019-2/1/2019" – "Performance Appraisal/Evaluation & Performance Counseling, Telework Cancelled";
- From "12/5/2019-1/9/2019" [*sic*] – "Hostile Work Environment/Harassment, Physical Disability, Workers Compensation Discrimination, FMLA Discrimination";
- From "5/2018-12/2018" – "Training, Harassment/Hostile Work Environment"

(Doc. 31-2.) In EEO Case 1067, the agency accepted for investigation Plaintiff's claims for hostile work environment based on race (Black), disability, age, sex (male) and reprisal (prior EEO activity), as evidenced by the following events:

> 1. On January 9, 2019, Marjie Miller (MM), Supervisory, denied [Plaintiff's] telework agreement based on his performance appraisal rating.
>
> 2. From May 2018 to March 2019, [Plaintiff] did not receive enough reinforced training; had recently hired coworkers train him in the job he was doing; in November 2018, MM made degrading statements towards black men; between October and December 2018, during staff meetings, MM was critical of [Plaintiff's] work, would send him back for additional information, kept track of him, yelled and made faces at him; MM made a bias statement regarding [Plaintiff's] disability; in December 2018, [Plaintiff] was denied comp time; on or about January 15, 2019, MM restricted [Plaintiff's] interactions with a female; and MM continuously stripped away [Plaintiff's] duties and had younger coworkers train him and review his work.
>
> 3. On December 5, 2018, [Plaintiff] was issued an unacceptable performance rating for the 2017/2018 rating period.
>
> 4. On January 29, 2019, [Plaintiff] was issued a performance counseling, after falling in the Agent Cashier's Office earlier that day, and file a workers compensation claim.

7

    5. On March 4, 2019, MM removed [Plaintiff's] duties as Alternate Agency Cashier.

(Doc. 19-8 at 1-2.) EEO Case 4686 involved the following claims accepted for investigation:

    Whether complainant was subject to a hostile work environment based on Race (Black), Disability, Age, Sex (Male), and Reprisal when:

    A: On June 27, 2019, [Plaintiff] was constructively discharged from employment with VA, when he was forced to resign.

    B: On July 7, 2019, and continuing, [Plaintiff's] access to his Thrift Savings Plan funds was delayed.

    C: On July 17 and 20, 2019, [Plaintiff] was issued Letters of Indebtedness.

    D: [reprisal] On May 30, 2019, [Plaintiff's] Office of Workman's Compensation (OWCP) claims were reduced.

(*See id.* at 34.) The final agency decisions were issued on April 5, 2021, and April 7, 2021.

Further facts are set forth as necessary.

## II. Legal Standard

"Summary judgment is required if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. Ins. Co. v. Great Am. Ins. Co.*, 893 F.3d 1098, 1102 (8th Cir. 2018) (citations and quotation marks omitted). "In considering a motion for summary judgment, the court does not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue." *Morris v. City of Chillicothe*, 512 F.3d 1013, 1018 (8th Cir. 2008) (citation omitted). Instead, the Court views the evidence "in the light most favorable to the nonmoving party and giv[es] the nonmoving party the benefit of all reasonable inferences." *Fed. Ins. Co.*, 893 F.3d at 1102 (citation and quotation marks omitted).

A party may be entitled to summary judgment if the opposing party "'fails to make a showing sufficient to establish the existence of an element essential to that party's case.'" *Hodge ex rel. Farrow v. Walgreen Co.*, 37 F.4th 461, 464 (8th Cir. 2022) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted). In other words, while the summary judgment "movant has the burden of showing that there is no genuine issue of fact, . . . the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." *Hodge*, 37 F.4th at 464 (citation and quotation

marks omitted). Once a summary judgment movant has satisfied his or her burden, the non-movant must point to some "affirmative evidence, specific facts, showing that there is a genuine dispute" as to a material fact. *Id.* (citation and quotation marks omitted).

### III. Discussion

Plaintiff asserts the following three claims in this lawsuit against his former government employer: (1) Count One – race, age, disability, and sex discrimination (disparate treatment); (2) Count Two – hostile work environment based on race, color, disability, and sex; and (3) Count Three – retaliation.

#### A. Preliminary Issues

##### 1. Waiver

First, the Court notes that Plaintiff's claims for discrimination, hostile work environment, and retaliation involve pre- and post-employment allegations against the Kansas City VA. To the extent Plaintiff's claims are based on the latter timeframe (specifically, the claims involving the reduction of his worker's compensation claim, the delayed access to TSP funds, and the Letters of Indebtedness), Plaintiff waived these claims because he failed to oppose Defendant's motion for summary judgment as to these specific grounds. *See Robinson v. Am. Red Cross*, 753 F.3d 749, 754 (8th Cir. 2014) ("By not opposing the Red Cross motion for summary judgment on her claims that she was not promoted to the DOT Administrator and Administrative Assistant positions due to race discrimination, [Plaintiff] has waived those claims.") (citing *Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009)).

##### 2. Title VII Claims Based on Age and Disability

Second, although not addressed by either party, Title VII – the only statutory basis under which Plaintiff asserts his claims in this lawsuit – does not cover age or disability discrimination. *See* 42 U.S.C. § 2000e-16(a) (prohibiting in federal employment "discrimination based on race, color, religion, sex, or national origin"). Accordingly, to the extent Plaintiff asserts a Title VII claim based on his age or any disability, summary judgment is entered in favor of Defendant because Title VII does not cover such claims. *See Enowmbitang v. Seagate Tech., Inc.*, 148 F.3d 970, 973 (8th Cir. 1998) ("A district court may properly grant summary judgment sua sponte and without prior notice if the losing party has failed to state a claim upon which relief may be granted.") (citation and quotation marks omitted).

### 3. Administrative Exhaustion

Third, Title VII plaintiffs must exhaust administrative remedies before bringing civil claims. *Wilkie v. Dep't of Health & Human Servs.*, 638 F.3d 944, 949 (8th Cir. 2011). For federal employees, this means they must first "'try to informally resolve the matter'" by "'consult[ing] a[n] EEO] Counselor prior to filing a complaint.'" *Id.* (quoting *Bailey v. United States Postal Serv.*, 208 F.3d 652, 654 (8th Cir. 2000)) (second alteration in original); *see McAdams v. Reno*, 64 F.3d 1137, 1141 (8th Cir. 1995) (explaining the "comprehensive statutory and regulatory scheme" for federal employees to exhaust administrative remedies to pursues Title VII claims); 42 U.S.C. § 2000e-16(c). Here, the only exhaustion issue raised by Defendant appears to concern the *scope* of Plaintiff's properly exhausted Title VII claims. In other words, Defendant argues that Plaintiff has properly exhausted his Title VII claims as they relate to or concern his supervisor (Ms. Miller) but has not properly exhausted a Title VII claim based on the actions of any other person. More specifically, Defendant argues that because the relevant administrative charges only raised concerns with Ms. Miller's conduct, Plaintiff's claims here (including his claim for hostile work environment based on racial harassment) are accordingly limited to those instances of Ms. Miller's alleged conduct. (*See* Doc. 19 at 22 & 25 n.1.)

The Eighth Circuit has explained that "[t]he proper exhaustion of administrative remedies gives the plaintiff a green light to bring his or her employment-discrimination claim, along with allegations that are like or reasonably related to that claim, in federal court." *Parisi v. Boeing Co.*, 400 F.3d 583, 585 (8th Cir. 2005) (cleaned up). Employment-discrimination claims asserted in federal court "may be as broad as the scope of the [administrative] investigation which reasonably could be expected to result from the administrative charge." *Id.* (citation omitted).

Defendant does not dispute that Plaintiff raised a race-based hostile-work-environment claim in the administrative proceedings prior to filing this lawsuit. In *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), cited by Plaintiff, the Supreme Court explained that hostile work environment claims are "different in kind" from claims based on discrete acts of retaliation or discrimination. *Id.* at 115. The critical difference is that, by their very nature, claims of hostile work environment "involve[] repeated conduct," and "cannot be said to occur on any particular day," but rather constitute an unlawful employment practice that occurs "over a series of days or perhaps years." *Id.* Simply put, "[a] hostile work environment claim is composed of a series of separate acts that collectively construe one 'unlawful employment practice.'" *Id.* (citation

10

omitted). In *Morgan*, then, the Supreme Court held that, in the context of the timely filing rule for Title VII claims (i.e., when a charge of discrimination must be filed relative to when the "unlawful employment practice occurred," *see* 42 U.S.C. § 2000e-5(e)(1)), a hostile work environment claim is timely filed so long as "an act contributing to the claim occurs within the filing period." *Id.* at 117; *accord id.* at 118 ("In order for the charge to be timely, the employee need only file a charge within [the statutorily prescribed] days of any act that is part of the hostile work environment.").

The Court finds that *Morgan* persuasively demonstrates the basic principle applicable here: an otherwise timely filed hostile work environment claim encompasses allegations and acts that are part of the same hostile environment claim. *See id.* at 120-21; *Jenkins v. Mabus*, 646 F.3d 1023, 1027 (8th Cir. 2011) (the question of "whether the acts about which an employee complains are part of the same actionable hostile work environment practice" depends on the similarity, frequency, and severity of the alleged acts) (citations and quotation marks omitted). Plaintiff's hostile-work-environment claim raised in the EEO administrative proceeding fairly appears to have been based on racially charged comments and other actions by his supervisor to alienate him from his co-workers. In other words, the Court will consider here acts or comments with sufficient similarity that are part and parcel to Plaintiff's hostile-work-environment claim asserted in the administrative proceedings.[5]

### B. Count Two – Title VII Hostile Work Environment Claim

As Plaintiff's complaint and summary judgment briefing make clear, the main thrust of this lawsuit is Plaintiff's claim for hostile work environment based on racial harassment as alleged in Count Two. Accordingly, the Court first turns to Count Two, and will consider Counts One and Three, below.

To establish a prima facie case of hostile work environment based on racial harassment, a plaintiff must show: (1) he is a member of a protected group; (2) he was "subjected to unwelcome

---

[5] To the extent Plaintiff's other allegations supporting his hostile-work-environment claim are based on actions by coworkers as opposed to supervisors, the Court notes that a different standard would generally apply to such claim. Specifically, "when a plaintiff attempts to establish a hostile work environment based on the actions of co-workers, he . . . must then present evidence that the employer knew or should have known about the harassment and failed to respond in a prompt and effective manner." *Anderson v. Durham D&M, LLC*, 606 F.3d 516, 519 (8th Cir. 2010) (citation and quotation marks omitted). Plaintiff does not point to sufficient evidence to support his burden of establishing a hostile-work-environment claim based on actions or comments by co-workers and does not otherwise appear to rest his hostile-work-environment claim on this basis. Accordingly, the Court only considers allegations of actions or comments by other supervisors rather than other co-workers.

11

race-based harassment," (3) "the harassment was because of [his] membership in the protected group"; and (4) "the harassment affected a term, condition, or privilege" of his employment. *Stone v. McGraw Hill Fin., Inc.*, 856 F.3d 1168, 1175 (8th Cir. 2017) (citation and quotation marks omitted). "Harassment which is severe and pervasive is deemed to affect a term, condition, or privilege of employment." *Id.* (citation and quotation marks omitted). "For harassment to affect a condition of employment the conduct must be severe as it would be viewed objectively by a reasonable person and as it was actually viewed subjectively by the victim." *Elmahdi v. Marriott Hotel Servs., Inc.*, 339 F.3d 645, 652 (8th Cir. 2003) (citation and quotation marks omitted). Relevant factors include the frequency, severity, nature (i.e., whether it is "physically threatening or humiliating or a mere offensive utterance"), and impact (i.e., whether it "unreasonably interferes with an employee's work performance") of the asserted harassing conduct. *Id.* (citing *Duncan v. Gen. Motors Corp.*, 300 F.3d 928, 934 (8th Cir. 2002)).

Ultimately, "[h]ostile work environment claims are assessed on the totality of the circumstances." *O'Brien v. Dep't of Agric.*, 532 F.3d 805, 809 (8th Cir. 2008) (recognizing also that "[t]he frequency of the alleged harassment is only one of the relevant factors in determining whether it was sufficiently severe or pervasive") (citations omitted). A plaintiff asserting a race-based hostile work environment claim must show a workplace "permeated with discriminatory intimidation, ridicule, and insult." *Id.* (citation and quotation marks omitted). In other words, "a few isolated incidents of racially-oriented [*sic*] harassment or hostility is insufficient to establish a violation"; rather, the employee "must convince the trial court that he or she has endured a steady barrage of opprobrious racial comment." *Ways v. City of Lincoln*, 871 F.2d 750, 754 (8th Cir. 1989) (citations and quotation marks omitted)

Here, the summary judgment record, viewed in the light most favorable to Plaintiff, does not support a finding of racially charged conduct or comments by supervisors rising to the substantial level required to sustain a hostile-work-environment claim. Plaintiff's allegations of a racially hostile work environment include Ms. Miller's references to "these people" in staff meetings, which Plaintiff understood as referring to African-Americans, and being called "boy" by others including a prior supervisor (although Plaintiff makes no such allegation against Ms. Miller). In addition, Defendant does not dispute that Ms. Miller separately met with and separately emailed Plaintiff and another black employee (Sonja Anderson, one of the other three GS-6 Accounting Technicians, including Plaintiff) and "gave them different information than the other

12

teams."[6] And finally, Plaintiff testified in his deposition that a prior supervisor had questioned whether Plaintiff's degrees were "real " and whether Plaintiff had actually earned them. (Doc. 19-1 at 30.)

Although the Court in no way condones the alleged behavior, the Court finds the racial slurs and other conduct as alleged by Plaintiff here – even by a supervisor – does not rise to the level required of a hostile-work-environment claim in the Eighth Circuit. *See Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 759 (8th Cir. 2004) (holding "[a] hostile work environment exists when the workplace is dominated by racial slurs, but not when the offensive conduct consists of offhand comments and isolated incidents"; racially offensive remarks approximately once a month for two years by company's owners did not create a hostile work environment under the law); *cf. Ellis v. Houston*, 742 F.3d 307, 321 (8th Cir. 2014) (evidence of "near daily" racist jokes in a group setting routinely led by a supervisor was sufficient to support hostile work environment claim against the supervisor); *Ross v. Douglas Cty., Neb.*, 234 F.3d 391, 396 (8th Cir. 2000) (evidence that the plaintiff was "constantly referred to . . . by a racial epithet" was sufficient to support jury's verdict in favor of plaintiff on hostile work environment claim). Plaintiff's allegations regarding the reporting of his mistakes and Ms. Miller's other interactions do not rise to the level of severity and pervasiveness required for a hostile work environment claim, either. *See Bradley v. Widnall*, 232 F.3d 626, 631-32 (8th Cir. 2000), *abrogated on other grounds by Torgeson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011) (holding plaintiff's allegations that the "frustrating work situation" including curtailing of supervisory duties, being left out of the decision-making process, having been treated with disrespect and subject to false complaints did not rise to the level required of a hostile work environment claim). The Court finds that, considered in totality, the incidents alleged by Plaintiff do not rise to a level of seriousness or pervasiveness to sustain a claim for hostile work environment based on racial harassment. *See Smith v. Fairview Ridges Hosp.*, 625 F.3d 1076, 1085-87 (8th Cir. 2010), *abrogated on other grounds by Torgeson* (holding picture of Buckwheat, comment about fried chicken, reference to the ghetto, among other racially insensitive and unwelcome harassment did not satisfy they high bar to sustain a hostile-work-environment claim).

---

[6] Plaintiff, Sonja Anderson, and Juanita Coleman were the three GS-6 Accounting Technicians, while the accounting section included four GS-11 Accountants, a GS-6 Financial Accounts Technician, and an Agent Cashier. (*See* Doc. 19-2.) It is not clear what Plaintiff means by "other teams."

Accordingly, Defendant is entitled to judgment as a matter of law as to Count Two.

### C. Count One – Title VII Discrimination Claim; Count Three – Title VII Retaliation Claim

A plaintiff can establish a discrimination claim by presenting either direct evidence or circumstantial evidence of discrimination. *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 873 (8th Cir. 2010); *Carraher v. Target Corp.*, 503 F.3d 714, 716 (8th Cir. 2007). Where, as here, a plaintiff relies on circumstantial evidence, the Court must apply the familiar *McDonnell-Douglas* burden-shifting framework to analyze the particular plaintiff's Title VII claims. *Id.* *Lake* summarizes the framework well:

> Under *McDonnell Douglas*, the plaintiff initially has the burden to establish a prima facie case of discrimination. A prima facie case creates a rebuttable presumption of discrimination. The burden then shifts to the defendant to provide a legitimate, nondiscriminatory reason for its decision. If the defendant provides such a reason, the presumption disappears, and the burden shifts back to the plaintiff to show that the proffered reason was pretext for discrimination.

*Lake*, 596 F.3d at 873-74 (internal citations and quotations omitted).

To establish a prima facie case of discrimination (whether based on race or sex), a plaintiff must establish: (1) he is a member of a protected group; (2) he was meeting the legitimate expectations of his job duties; (3) he suffered an adverse employment action or actions; and (4) there is a causal connection between the plaintiff's membership in the protected group and the asserted adverse employment action(s). *Faulkner v. Douglas Cty. Neb.*, 906 F.3d 728, 732 (8th Cir. 2018) (sex or gender discrimination); *Singletary v. Mo. Dep't of Corrs.*, 423 F.3d 886, 891 (8th Cir. 2005) (race discrimination). Similarly, to establish a prima facie case of retaliation, a plaintiff must establish: "(1) he engaged in protected conduct, (2) he suffered a material adverse employment action, and (3) the adverse action was causally linked to the protected conduct." *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1021 (8th Cir. 2011) (citation and quotation marks omitted).

To demonstrate a prima facie case for both discrimination and retaliation, Plaintiff must show that he suffered an adverse employment action. Generally, an adverse employment action is understood as a "tangible change in working conditions that produces a material employment disadvantage." *Jackman v. Fifth Judicial Dist. of Corr. Servs.*, 728 F.3d 800, 804 (8th Cir. 2013) (citation omitted). In *Jackman*, the Court explained that "minor changes in duties or working conditions . . . which cause no materially significant disadvantage, do not rise to the level of an adverse employment action." *Id.* (citation omitted). Examples of adverse employment actions

14

generally include termination, a cut in benefits or in pay, "changes that affect an employee's future career prospects," and "circumstances amounting to a constructive discharge." *Id.* (citation omitted). As the Eighth Circuit has explained, the critical inquiry is whether the alleged discrimination or retaliation "produce[d] some 'injury or harm.'" *Aubuchon v. Geithner*, 743 F.3d 638, 644 (8th Cir. 2014) (quoting *Littleton v. Pilot Travel Ctrs., LLC*, 568 F.3d 641, 644 (8th Cir. 2009)) (collecting cases finding "as a matter of law that certain employer actions were not materially adverse because they did not result in sufficient 'injury or harm'").

> In *Littleton*, the Court explained that
>
> commencing performance evaluations, or sending a critical letter that threatened "appropriate disciplinary action," or falsely reporting poor performance, or "lack of mentoring and supervision" were actions that did not establish a prima facie case of retaliation, absent showings of materially adverse consequences to the employee.

568 F.3d at 644 (collecting cases). In that case, for instance, the Title VII plaintiff was issued a "Correction Notice" after plaintiff's manager complained to the manager's supervisor about plaintiff's conduct. *Id.* at 643. The Correction Notice stated that "Failure to correct & not repeat these issues [otherwise stated in the form] will result in immediate termination of employment." *Id.* In affirming the grant of summary judgment in defendant's favor, the Eighth Circuit held that the plaintiff failed to show that the notice "harmfully impacted his employment." *Id.* at 644. In doing so, the Eighth Circuit reasoned: "[Plaintiff] did not suffer a loss of pay or hours, his responsibilities did not change, and he was not excluded from any training or mentorship available to other employees." *Id.* Similarly, in another case, the Eighth Circuit held that a poor performance rating on its own does not constitute an adverse employment action: "An unfavorable evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." *Turner v. Gonzalez*, 421 F.3d 688, 696 (8th Cir. 2005) (citation and quotation marks omitted); *see Givens v. Cingular Wireless*, 396 F.3d 998, 998 (8th Cir. 2005) (hold that "placing [a plaintiff] on a 'performance improvement plan,' without more, d[oes] not constitute an adverse employment action") (citation omitted).

In opposing Defendant's motion for summary judgment on this basis, Plaintiff points to several "adverse actions": the unacceptable performance ratings (followed by performance job counseling); the lack of training and "humiliating commentary"; and constructive discharge. (Doc. 30 at 50-52.) First, Plaintiff has not demonstrated the 2018 performance evaluation or subsequent

performance improvement plan harmed or injured aspects of his employment such as pay, responsibilities, training opportunities, or any other terms or conditions of his employment. Plaintiff suggests the negative performance review and performance plan have "specific consequences" under the applicable collective bargaining agreement, including that the CBA requires reassignment, demotion, or removal from service as a result of the performance rating and performance plan. (Doc. 30 at 50.) Yet Plaintiff provides no evidence this is the case. Plaintiff submitted what he represents is Article 27 of the applicable CBA (Doc. 31-18); yet nothing in that exhibit establishes that reassignment, demotion, or removal from service is a consequence of the performance evaluation he received. Moreover, Plaintiff does not allege, and no evidence suggests, that he was in fact reassigned, demoted, or removed from service as a result of either the 2018 performance evaluation or subsequent performance plan.[7] Finally, to the extent Plaintiff suggests that the 2018 performance evaluation was completed as it was in retaliation for his earlier complaints, Plaintiff fails to show any causal connection between his prior complaints and the performance evaluation. *Littleton*, 568 F.3d at 645. Although Ms. Miller said she was aware that Plaintiff had had "issues" in the past, she was unaware of what those issues were, and did not allow Plaintiff to explain his prior issues when he tried to do so in a later meeting. Indeed, Ms. Miller became Plaintiff's supervisor after Mr. Hill's prior complaints had been resolved.

Second, Plaintiff claims he was systematically denied meaningful training opportunities (both for the position he held and for advancement) and was "continuously monitored, spied upon, denigrated and humiliated" in the manner of supervision by his supervisor. Plaintiff does not claim these actions – even accepting them at face value as true – "led to a decrease in [his] pay or benefits or affected [his] future career prospects, and thus th[ese] alone cannot constitute an adverse employment action." *Higgins v. Gonzales*, 481 F.3d 578, 585 (8th Cir. 2007). Plaintiff asserts

---

[7] It is undisputed that employees with low performance evaluations are not permitted to telework. Plaintiff makes no suggestion, however, the inability to telework raises to the level of a "materially adverse consequence" to find the negative 2018 performance evaluation is an adverse employment action giving rise to a Title VII discrimination claim on this basis alone, however. *See Aubuchon*, 743 F.3d at 644. Similarly, Plaintiff draws no connection whatsoever between the 2018 negative performance evaluation and the March 2019 temporary removal of one of his particular duties while he was out on FMLA leave. Even if he did, "job reassignment involving no corresponding reduction in salary, benefits, or prestige is insufficient to establish an adverse employment action." *Higgins v. Gonzalez*, 481 F.3d 578, 585 (8th Cir. 2007) (citing *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994), *abrogated on other grounds by Torgeson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011). Plaintiff asserts no such facts and points to no evidence this was the case, either, however.

that he was "shorn of all of his duties save one." (Doc. 30 at 49.) There is no evidence this was the case, however. Only one job responsibility was removed from Plaintiff, and that removal occurred while he was on FMLA leave. Plaintiff does not provide any evidence the temporary removal of these duties otherwise materially impacted his employment situation. Indeed, Plaintiff never returned to work after taking medical leave in February 2019.

Plaintiff also argues that he was "watched more closely, singled out and treated in demeaning ways" more generally, and that he was "constantly harassed." (Doc. 30 at 50.) Plaintiff appears to rely on *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir. 1997), generally holding that "a series of employment actions falling short of termination may constitute adverse employment actions." *Jones v. Fitzgerald*, 285 F.3d 705, 715 (8th Cir. 2002) (citing *Kim*, 123 F.3d at 1060). In *Kim*, the Eighth Circuit held that a defendant's "systematic[] retaliat[ion]" against the plaintiff – "which included reduction of duties, disciplinary action and negative personnel reports, as well as remedial training" which were all "taken in response to [plaintiff's] filing the employment discrimination charge" – constituted an adverse employment action. 123 F.3d at 1060. Here, none of the actions to which Plaintiff refers can be connected his prior filing of a prior complaint, the underlying discrimination complaints, or any other protected activity, and thus *Kim* is distinguishable from this case.

Finally, Plaintiff alleges that he suffered an adverse employment action to the extent he asserts he was constructively discharged. Constructive discharge is an adverse employment action. *Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 616 (8th Cir. 2007). "To prove a case of constructive discharge, a plaintiff must show (1) a reasonable person in his situation would find the working conditions intolerable, and (2) the employer intended to force him to quit." *Id.* (citation omitted). Stated another way, "an employee must show that [his] employer deliberately created objectively intolerable working conditions with the intention of forcing the employee to resign and that the employee actually resigned as a result of those conditions." *Moisant v. Air Midw., Inc.*, 291 F.3d 1028, 1032 (8th Cir. 2002)

Here, Plaintiff claims that he was constructively discharged under the circumstances surrounding the June 7, 2019 meeting. Specifically, Plaintiff argues that based on his unacceptable performance review and counseling that had occurred and his understanding of the applicable policy, he was "left in the position that he would be terminated, demoted or reassigned," and that "[i]nstead of that, he was forced to resign." (Doc. 30 at 52.) There is no evidence, however, that

17

the result of his unacceptable performance review was termination, demotion, or reassignment. Moreover, Plaintiff cannot demonstrate constructive discharge having failed to demonstrate material adverse employment action on any of the same incidents. *Aubuchon v. Geithner*, 743 F.3d 638, 645 (8th Cir. 2014). To the extent Plaintiff's constructive discharge claim is based on the same allegations as supporting his hostile work environment claim, which fails for the reasons explained above, this argument is similarly without merit. *Wilkie v. Dep't of Health & Human Servs.*, 638 F.3d 944, 954 (8th Cir. 2011); *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 495 (8th Cir. 1996).

Plaintiff testified that while he was out on medical leave, he became nervous and "wrote a resignation letter out of fear of being terminated." (Doc. 19-1 at 22.) Plaintiff specifically stated that he began writing his letter of resignation after he received an email from Mr. Bieri regarding the topics of the scheduled meeting and because he "did not want to be terminated." (*Id.*) Plaintiff testified that he submitted his resignation when he showed up at the scheduled meeting with Mr. Bieri to find several other people at the meeting including a representative from human resources, his supervisor, and the assistant CFO. As a result, he believed he was going to be terminated. Rather than be terminated, Plaintiff resigned so that he could have the opportunity to reapply and come back to the fiscal division. (*Id.* at 23.) In sum, a reasonable fact finder could not conclude Plaintiff was constructively discharged.

Accordingly, the Court finds that Plaintiff has failed to establish a prima facie case of discrimination or retaliation to the extent he has not shown an adequate adverse action necessary to support these claims. Defendant is therefore entitled to judgment as a matter of law as to Counts One and Three.

## IV. Conclusion

For the reasons explained above, Defendant's motion for summary judgment (Doc. 19) is **GRANTED**. Judgement is entered in favor of Defendant.

**IT IS SO ORDERED**.

s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT

DATED: February 16, 2023